Filed 8/10/26  22310 PCH v. County of Los Angeles CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| 22310 PCH, LLC,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES,<br><br>        Defendant and Respondent. | B342497<br><br>(Los Angeles County<br>Super. Ct. No. 23STCV08232) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christopher K. Lui, Judge.  Affirmed.

Greenberg Traurig, Colin W. Fraser, and Cris K. O'Neall for Plaintiff and Appellant.

Renne Public Law Group, Michael K. Slattery, Thomas G. Kelch, Ryan P. McGinley-Stempel, and Zoe Tatarsky for Defendant and Respondent.

* * * * * *

A buyer set a record-breaking transaction when it purchased a home on Malibu's Carbon Beach for $110 million in April 2018.  Because it was an off-market transaction, the purchase price does not presumptively govern the home's fair market value for purposes of assessing property taxes.  The buyer and the local taxing authority therefore presented competing comparative sales analyses to the assessment appeals board, with the buyer advocating for a $36 million value and the local taxing authority advocating for a $105 million value.  The board rejected the buyer's analysis because it relied on sales that were not comparable to the home.  Because substantial evidence supports the $103 million fair market valuation found by the board, we affirm the trial court's judgment dismissing the buyer's refund action challenging the board's valuation.

## FACTS AND PROCEDURAL BACKGROUND
### I.    Facts
#### A.    *The property*
Situated on two parcels at 22258 and 22310 Pacific Coast Highway in Malibu, California sits a residential compound.  Built in 2005 using the costly construction method of concrete and steel, the property, which is hidden behind security gates and trees, consists of:  (1) a 4,618 square foot, two-story, L-shaped main residence with four bedrooms and five bathrooms; (2) a 2,316 square foot guest house with three bedrooms and four

2

bathrooms, as well as a movie screening room; (3) a large lap pool; (4) extensive decking joining the structures and traversing the native landscaped grounds; and (5) 131 linear feet of beach frontage. The two-parcel lot is 30,254 square feet, of which 16,630 is usable.

The property was designed by Richard Meier, the architect responsible for The Getty, and utilizes plantation-grown teak as the primary design feature—teak cladding covers the exterior, teak shutters control the influx of light and ocean breeze, and teak decking stretches the length of the beach frontage. The wood must be oiled multiple times each year to maintain its sheen.

The property is located in Malibu's Carbon Beach neighborhood, which is "one of the most exclusive and expensive stretches of sand in the world." Carbon Beach has been coined "Billionaire's Beach" to signify the type of residents the neighborhood attracts.

### B. *Purchase of the property*

Sometime before April 2018, a Canadian natural gas billionaire and his spouse began renting the property. They decided they wanted to buy it as a vacation home, and made an unsolicited offer of $90 million. The then-owner[1] demanded $110 million, and the couple agreed to that price.

The $110-million sale closed on April 24, 2018, with the couple's entity, 22310 PCH LLC (the owner), holding the property.[2] The transaction was reported as "the most expensive

---

[1]     The property was owned by Peter Morton, who founded the Hard Rock Café restaurants and casino.
[2]     The purchase price did not include the furniture and artwork in the home.

home sale ever [in] Los Angeles County" at the time, surpassing the $100-million sale of the Playboy mansion.

Two months after the purchase, the owner obtained an $85 million bank loan secured by the property.

### C.   *Enrolled value*

Upon the property's change in ownership, the County of Los Angeles (the County) enrolled the $110 million purchase price as the new "base year value" of the property for purposes of assessing annual property taxes.  Specifically, the two parcels of land were valued at $107 million and the improvements were valued at $3 million.

### D.   *Owner's assessment appeal*

#### 1.   *Application*

On March 26, 2019, the owner filed an assessment appeal application with the County's Assessment Appeals Board (the Board) challenging the enrolled value.

#### 2.   *Hearing*

The Board conducted a hearing on the owner's appeal on May 3, 2022.

Because the owner asserted that it did not buy the property in an open-market transaction and therefore rebutted the presumption that the purchase price governed, the hearing involved competing opinions of the property's fair market value using the comparative sales approach.  Pursuant to that approach, the owner and the County each presented sales of other homes that were comparable to the property (i.e., "comps") and made appropriate adjustments to characteristics of the comps that differed from the property to try to produce an apples-to-apples comparison.

Based on their different sets of comps, the owner and the County presented divergent opinions as to what the property would have sold for in the open market.

a.    The owner's comparative sales analysis

The owner asserted the property's fair market value is $36 million based on its comparative sales analysis.[3]

The owner's appraiser used three comps to arrive at that figure, which are summarized in the following chart with upward or downward adjustments indicated by red text:

| | **The Property** | **22506 Pacific Coast Hwy** | **21614 Pacific Coast Hwy** | **22160 Pacific Coast Hwy** |
|---|---|---|---|---|
| **Location / Distance** | Carbon Beach | Carbon Beach 0.3mi | La Costa Beach 1mi | Carbon Beach 0.2mi |
| **Improvements** $300/sqf | 4,618sqf | 5,829sqf -$372,300 | 5,131 -$153,900 | 4,036 +$174,600 |
| **Bedrooms** $50,000/bed | 4 | 5 -$150,000 | 4 -$150,000 | 4 |
| **Bathrooms** $25,000/bath | 5 | 6 -$25,000 | 7 -$50,000 | 4 +$25,000 |
| **Pool** $50,000 | Yes | Yes | None +$50,000 | None +$50,000 |
| **Guest house** $1,000,000 | Yes | Yes | None +$1,000,000 | None +$1,000,000 |
| **Extras** | | Tennis court -$200,000 | | |
| **Lot size** | 30,254 | 31,800 | 8,640 | 10,020 |
| **Usable size** $2,000/sqf | 16,630 | 19,000 -$4,740,000 | 8,640 +$15,980,000 | 10,020 +13,220,000 |

---

[3]    In its appeal application, the owner claimed the property's fair market value was $65 million.

5

|  | The Property | 22506 Pacific Coast Hwy | 21614 Pacific Coast Hwy | 22160 Pacific Coast Hwy |
|---|---|---|---|---|
| Beach frontage $50,000/ft | 131 | 137 -$300,000 | 45 +$4,300,000 | 60 +$3,550,000 |
| Construction date / effective year built | 2005 | 1932 / 1971 | 1978 / 2000 | 1956 / 1975 |
| Quality class | CX | 12D +$1,900,000 [5%] | D11.5C +$723,750 [5%] | D9.5B +$935,000 [5%] |
| Sale date | 4/24/18 | 3/22/18 | 6/30/17 | 6/29/18 |
| Sale price | $110m | $38m | $14.475m | $18.7m |
| Reconcile |  | -$3,887,300 | +$21,699,850 | +$18,954,600 |
| TOTAL |  | $34,112,700 | $36,174,850 | $37,654,600 |

The owner's appraiser did not make adjustments to the comps to account for variances between the property and the comps in (1) location (specifically, that 21614 Pacific Coast Highway was not located on Carbon Beach); (2) year of construction and effective year based on renovations (specifically, that all three comps were built decades ago); and (3) sale date (specifically, that 21614 Pacific Coast Highway was sold in different market conditions a year prior). He testified that adjusting the comps for "age of the structure" was not "necessary" because the listing photos showed those homes were in "very good condition" and because the high-net-worth buyers would renovate the homes anyway. The appraiser made a flat five-percent adjustment for any differences in quality class of construction, regardless of the degree of difference in quality class. The

appraiser adjusted the size of improvements at $300 per square foot because "maybe it would cost [that] to build extra space."

According to the owner's appraiser, "[t]here was nothing . . . special" or "out of the ordinary" about the property purchased by the owner.

b.     The County's comparative sales analysis

The County asserted the property's fair market value is $105 million based on its comparative sales analysis.[4]

The County's appraiser used two comps to arrive at that figure, which are summarized in the following chart with upward or downward adjustments indicated by red text:

|  | Subject Property | 22108 Pacific Coast Highway | 25040 Pacific Coast Highway |
|---|---|---|---|
| **Location** | Carbon Beach | Carbon Beach 0.21 miles | Bluffs 3.5 miles +$17,425,000 [20%] |
| **Improvements** $1,000/sqf | 4,618sqf | 2,279 +$2,339,000 | 9,000 -$4,382,000 |
| **Bedrooms** $45,000/each | 4 | 4 | 6 -$90,000 |
| **Bathrooms** $50,000/each | 5 | 4 +$50,000 | 7 -$100,000 |
| **Pool** | Yes | | |
| **Guest house** | Yes 3 bedrooms / 4 bathrooms | Yes 1 bedroom / 2 bathrooms +$638,000 | Yes 800sqf + $1,516,000 |

[4]     Because the County's opinion was within five percent of the enrolled value, the County argued for no reduction in the $110 million enrolled value.

7

|  | Subject Property | 22108 Pacific Coast Highway | 25040 Pacific Coast Highway |
|---|---|---|---|
|  |  | Second guesthouse -$1,000,000 |  |
| Extras |  | Inferior privacy +$4,897,500 [8%] | Ocean view +$4,356,300 [5%] Superior privacy -$4,356,300 [5%] Basement -$1,350,000 |
| Lot size | 30,254 | 39,584 | 231,619 |
| Usable size $1,000/sqft | 16,630 | 26,685 -$5,027,500 [used $500/sqf] | 135,438 -$5,940,400 [$50/sqf] |
| Beach frontage $50,000/ft | 131 | 280 -$7,450,000 | 0 +$6,550,000 |
| Construction date / effective year built | 2005 | 1948 / 1967 +$5,000,000 | 2012 / 2012 |
| Quality class | CX | D85D +$10,000,000 | DX +$2,500,000 |
| Sale date 15%/year | 4/24/18 | 5/2/17 +$12,750,000 | 2/9/18 +$2,125,000 |
| Sale price | $110,000,000 | $85,000,000 | $85,000,000 |
| Reconciliation |  | +$22,187,000 | +$18,253,600 |
| TOTAL |  | $107,187,000 | $103,253,600 |

The County's written comparative sales analysis noted that the property is "unique [and] for a unique buyer" and that there were "limited high value comps" on which to rely in preparing in

the analysis.[5]  The first comp used by the County was the publicized sale of David Geffen's Carbon Beach compound. However, that was not an open-market transaction and the County's analysis employed data from the assessor's records that did not include aspects visible in aerial images or described in news articles about the sale (such as the number of parcels and improvements).

The County's witness who testified at the hearing was not the appraiser who prepared the written analysis.  When questioned about certain adjustments the County made to its two comps, the witness could not opine as to the preparing appraiser's reasoning and testified the adjustments were based on "appraiser judgment."  The witness testified that while the County's written analysis stated the comps' usable lot size would be adjusted according to $1,000 per square foot, that characteristic was adjusted by $500 per square foot for the first comp on Carbon Beach and $50 per square foot for the second comp on the bluffs. The witness testified that he did not disagree with the preparing appraiser's analysis given the varying values for beach-side and bluff-side land in Malibu, but that the adjustment also could have been accounted for in the location characteristic instead.

### 3.      *Decision*

The Board issued its decision on October 17, 2022, finding "by a preponderance of the evidence that the fair market value for the [] property . . . is $103 million."

The Board found, as a threshold matter, that the owner met its burden of rebutting the presumption that the purchase price governed by showing the property "was not exposed for sale

---

[5]      The owner's agent agreed, stating in closing argument that "[t]here's not a lot of sales on this beach."

in the open market." However, in establishing the value of the property had it been sold under open-market conditions, the Board found that none of the owner's three comps were "comparable" to the property. Specifically, the Board found "enormous dissimilarity in regard to character, quality class and age" between the property and the owner's comps. Considering the "real estate principal of substitution"—that is, setting a property's value according to the cost of acquiring "an equally desirable substitute" property—the Board found that no buyer of a $110 million property would consider a $36 million property an adequate substitute.

The Board further found, on the other hand, that the County's first comp on Carbon Beach was "similar" to the property. Although it was not sold in the open market, the Board confirmed that comps "were scarce" and, therefore, the off-market comp could be used since it was "the best or only available data." To account for that comp not being exposed to open-market conditions, the Board assigned it only 45-percent weight (and the second, bluff-side comp 55-percent weight) in determining the property's fair market value. The Board also adjusted the usable lot size for the County's first comp according to $1,000 per square foot (which it pegged as between the County's $500 per square foot and the owner's $2,000 per square foot calculations).

## II.    Procedural Background

### A.    *Refund action*

The owner challenged the Board's decision by bringing a lawsuit against the County on April 13, 2023, seeking a refund of the property taxes it paid pursuant to the improper valuation of the property.

**B.** *Ruling*

Following the submission of trial briefs, a hearing, and the issuance of a proposed statement of decision followed by objections, the trial court rendered a final statement of decision on August 30, 2024 denying the owner's claim.

The court ruled that the Board "properly discharged its duties" by making a "detailed evaluation" of the parties' evidence, making "criticisms of both" sets of comps, and basing its determination of fair market value "on what [the Board] found to be the more credible evidence—the [County's] comparable sales." Specifically, the trial court found the Board's rejection of the owner's comps "well supported" because those comps were of "lesser quality" and because age was "an important factor" that the owner made no adjustments for. The court further found that the Board "properly exercised its discretion" in considering the County's first comp despite it not being an open-market transaction.

**C.** *Appeal*

Following the entry of judgment for the County, the owner timely filed this appeal.

## DISCUSSION

The owner's challenge to the Board's valuation of the property turns on how the comparative sales approach should be applied where there are a limited number of transactions that are similar to the property at issue.

## I. Governing Law

**A.** *Valuation of property for assessment of taxes, generally*

When a piece of real property changes ownership, the local assessor is required by the California Constitution to determine a

11

new base year value for that property—that is, the "full cash value" or "fair market value" of the property. (Cal. Cons., art. XIII, § 1(a); *id.*, art. XIIIA, § 2(a); Rev. & Tax. Code, § 110.1, subd. (b).) "[A]fter a property's base year value is determined, subsequent entries onto the assessment rolls [generally] are done pro forma without the need to exercise one's judgment as to value, simply by applying an inflation factor to the previous year's entry." (*Montgomery Ward & Co. v. County of Santa Clara* (1996) 47 Cal.App.4th 1122, 1137.)

The "purchase price paid in the transaction" is presumed to be the "full cash value" or "fair market value" of the property; however, that presumption can be rebutted by showing, by a preponderance of the evidence, that the property "would not have" sold for the "purchase price in an open market transaction." (Rev. & Tax. Code, § 110, subds. (a) & (b); Cal. Code Regs., tit. 18, §§ 321, subd. (e), 305.5, subd. (c); *Dennis v. County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1028 ["an arm's length, open market sale for a price that is not influenced by an exigency of either buyer or seller permits the assessor to presume fair market value from the purchase price, but the presumption may nevertheless be rebutted by evidence that the fair market value of the property is otherwise"].)

**B.**    *Hearing to determine fair market value*

Where a party disputes that the sale price reflects the fair market value of the property, the assessment appeals board for the county in which the property is located is entrusted with the "quasi-judicial" power to "equalize" the value of the property. (*Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 22; *Shell Western E & P, Inc. v. County of Lake* (1990) 224 Cal.App.3d 974, 979; *Steinhart v. County of Los*

*Angeles* (2010) 47 Cal.4th 1298, 1307; Cal. Const., art. XIII, § 16; Cal. Code Regs., tit. 18, §§ 301, subds. (a), (d) & (m), 302.) In so doing, the assessment appeals board exercises its special expertise in property valuation. (*Shell Western*, at pp. 979–980; *Stenocord Corp. v. City etc. of San Francisco* (1970) 2 Cal.3d 984, 988 ["disputes regarding valuation are within the special competence of the board of equalization"], superseded by statute on other grounds as stated in *Steinhart*, at p. 1311.)

Because the local assessor is presumed to have "properly performed" its duties, the burden is on the party who applies to the board challenging the enrolled value to overcome the presumption that the enrolled value—that is, the purchase price—is *not* correct.[6] (Cal. Code Regs., tit. 18, §§ 321, subd. (a), 313, subd. (c); *California Minerals, L.P. v. County of Kern* (2007) 152 Cal.App.4th 1016, 1022.) In proceedings where both the applicant and the local assessor present evidence, the board "must weigh all of the evidence to determine whether it has been established by a preponderance of the evidence that the assessor's determination [of value] is incorrect." (Cal. Code Regs., tit. 18, § 321, subd. (b).) The "technical rules relating to evidence and witnesses" do not apply to hearings before the board, and "[a]ny relevant evidence may be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." (Rev. & Tax. Code, § 1609; Cal.

---

[6] The opposite applies—and the local assessor bears the burden of supporting its enrolled value—when the property is an owner-occupied single-family dwelling. (Rev. & Tax. Code, § 167; Cal. Code. Regs., tit. 18, § 321, subd. (d); *Mitchell v. County of Los Angeles* (1997) 60 Cal.App.4th 497, 500 (*Mitchell*).) Here, the owner has made no assertion that this rule applies.

Code Regs., tit. 18, § 313, subd. (e).)  But in weighing that evidence, the board must apply "the same evidentiary standard" to both sides' evidence.  (Cal. Code Regs., tit. 18, § 321, subd. (f).)  The board is not restricted to choosing "between the opinions of value promoted by the parties"—the board may "make its own determination of value based upon the evidence properly admitted at the hearing."  (*Id.*, § 324, subds. (a) & (b).)

### C. *The comparative sales approach*

In general, there are three basic appraisal approaches for determining a property's fair market value:  (1) the comparable sales approach; (2) the income or capitalization approach; and (3) the cost approach.  (*Olen Commercial Realty Corp. v. County of Orange* (2005) 126 Cal.App.4th 1441, 1446.)  The comparative sales approach—the one utilized in this case—is the "preferred method."  (Cal. Code Regs., tit. 18, § 4; *Farr v. County of Nevada* (2010) 187 Cal.App.4th 669, 686.)  Under that approach, the local assessor "examines and correlates the prices resulting in other transactions involving comparable properties [citation]; the validity of this method rests upon the assumption that comparable properties have comparable [fair market] values." (*Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 24.)

When selecting comps for the sales comparison approach, the comps must (1) have been sold "sufficiently near in time to the valuation date" and (2) be "sufficiently alike in respect to" (a) "character," (b) "size," (c) "situation," (d) "usability, (e) "zoning," or (f) "other legal restriction as to use."  (Rev. & Tax. Code, § 402.5, subd. (a); Cal. Code Regs., tit. 18, § 4, subd. (d); see also *Dressler v. County of Alpine* (1976) 64 Cal.App.3d 557, 567 (*Dressler*) [these "comparability factors . . . are similar to those

14

applied in eminent domain valuation"].)  The standard for comparability is "not absolute;" a comp need only be "sufficient[ly]" similar "to make it clear" that the comp "shed[s] light" on the fair market value of the subject property.  (Rev. & Tax. Code, § 402.5, subd. (a); *Dressler*, at p. 569; *Midstate Theaters, Inc. v. County of Stanislaus* (1976) 55 Cal.App.3d 864, 880 (*Midstate Theaters*).)  Thus, "[e]ven relatively poor data" can be used as a comp "if it is the best or only data available." (*Midstate Theaters*, at p. 880; cf. *Domenghini v. County of San Luis Obispo* (1974) 40 Cal.App.3d 689, 699 [where taxpayer fails to produce information, assessor may issue estimated assessment based on "the best information then available to him"].)

Where there are differences in the characteristics of a comp compared to the subject property, the local assessor must make "allowances" it "deems appropriate" to account for differences between the comp and the subject property, and to thereby "adjust" the comp's sale price.  (Cal. Code Regs., tit. 18, § 4, subds. (c) & (d).)

When the board makes its determination of value, it may consider only those comps that, "in [the board's] judgment, involve properties similar in size, quality, age, condition, utility, amenities, site location, legally permitted use, or other physical attributes to the property being valued."  (Cal. Code Regs., tit. 18, § 324, subd. (d).)

### D. *Standard of review*

""Although a local assessment appeals board decision arises from an administrative hearing process, the mechanism for seeking judicial review of the decision "'is significantly different from that of other administrative agency decisions. . . . [T]he aggrieved [property owner's] remedy is . . . to pay the tax and file

15

suit in superior court for a refund.""'""'"" (*RAR2 Villa Marina Center CA SPE, Inc. v. County of Los Angeles* (2023) 91 Cal.App.5th 1050, 1065.)

Where the property owner's refund action attacks the board's *application* of a valid valuation method, we review the record to determine whether the board's findings are supported by substantial evidence. (*Next Century Associates, LLC v. County of Los Angeles* (2018) 29 Cal.App.5th 713, 722 (*Next Century*); *Georgiev. V. County of Santa Clara* (2007) 151 Cal.App.4th 1428, 1437 (*Georgiev*) [where assessment is challenged "on the ground that a 'valid method' has been 'erroneously applied,'" assessment may be overturned only if board's valuation is "not supported by substantial evidence"]; *Phillis v. County of Humboldt* (2020) 59 Cal.App.5th 432, 440 [same].) But where the refund action attacks the *validity* of a valuation method used by the local assessor or board, our review is de novo. (*Ibid.*; *Main & Von Karman Associates v. County of Orange* (1994) 23 Cal.App.4th 337, 342 (*Main & Von Karman*) [appeal presents question of law where appellant's "contention goes to the *methodology* used (i.e., that the assessor violated the standards prescribed by law"]; *GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 1001 [same].)

## II. Analysis

Substantial evidence supports the Board's determination here that, based on the two comps the County relied upon in its comparative sales analysis, the fair market value of the property is $103 million.

There is no dispute that the owner overcame the purchase-price presumption because the transaction here was not conducted in the open market. The owner therefore had the

16

burden of showing, by a preponderance of the evidence, that the fair market valuation by the County was incorrect. It failed to do so. The County's two comps giving rise to the $103 million valuation are sufficiently alike to the property so as to shed light on the fair market value of the property. One is located on the desirable Carbon Beach, and while the other is located on the bluffs of Malibu, it is of a similar magnitude in luxury appeal. Like the property, the comps have several bedrooms and bathrooms, at least one guest house, and a pool. To be sure, the property is different from the comps in some noteworthy ways. The Carbon Beach property has a larger usable lot and greater beach frontage, but was constructed and renovated many years ago using inferior quality materials. The bluffs property has a larger residence, more privacy, and a massive usable lot size, but was also constructed using less desirable materials and located in a neighborhood that was not as renowned as Carbon Beach. The County's assessor accounted for these dissimilarities with various adjustments to the comps to bring them more in line with the attributes of the property. This is exactly what the law governing the comparative sales approach contemplates.

The owner raises what boils down to five arguments challenging the Board's finding.

First, the owner argues that the Board erred in selecting the County's comparative sales analysis over that of the owner's expert. However, the Board found that the owner's three comps were not sufficiently similar to the property to warrant reliance on those comps' sales prices in determining the fair market value of the property. We do not reweigh the evidence giving rise to that factual finding and defer to that finding if supported by substantial evidence—here, it is. (*Georgiev*, *supra*, 151

17

Cal.App.4th at p. 1437.)  Unlike the property, the owner's second and third comps had no pool or guesthouse, a substantially smaller lot size, and minimal beach frontage.  All three of the owner's comps were constructed decades ago with lower-grade materials.[7]  Unlike the County's analysis, the owner's appraiser did not make any adjustments to the comps for several critical comparison factors—namely, site location, year of construction and renovation, and sale date.  (See *Next Century*, *supra*, 29 Cal.App.5th at p. 723 [the board "has the power to disregard a valuation analysis it determines for good reason is unpersuasive"].)

The owner nevertheless asserts that the Board applied an "arbitrary" "double standard" in evaluating the parties' evidence, allowing the County to also use an older comp (the Carbon Beach property) and different construction quality but rejected the owner's comps for the same dissimilarities.  This argument ignores that the owner's appraiser refused to adjust the comps to account for the age of construction/renovation and made a uniform adjustment of construction class without regard for degree of class.  The Board noted this in its summary of the owner's evidence and therefore had a basis to find the County's comparative sales analysis more persuasive.  The owner further asserts that the Board improperly rejected its comps based on the "fallacy" that a buyer willing to pay $110 million for the property would not consider a $38 million home.  To be sure, determining fair market value does not necessarily involve the subjective

_____

[7]     The quality class rating of the property was CX, which means the masonry entailed the use of fireproof concrete in the walls.  This rating is not typical for a home and was superior to the ratings of the owner's comps.

18

desires of a specific buyer.  (See *Mola Development Corp. v. Orange County Assessment Appeals Bd.* (2000) 80 Cal.App.4th 309, 311–312 [the law "contemplates a hypothetical open market transaction"].)  But pursuant to the comparative sales approach for determining fair market value, comps "are those properties that effectively compete with (i.e., are close substitutes for the subject property)."[8]  (Bd. of Equalization, Assessors' Handbook, Advanced Appraisal, § 502, ch. 3 (Dec. 1998), p. 35.)  The Board therefore acted well within its discretion in finding that the owner's comps—which sold for $38 million, $14.475 million, and $18.7 million—were not valid substitutes for purposes of evaluating the property's value because they did not effectively compete with the owner's $110 million purchase.  (Cal. Code Regs., tit. 18, § 324, subd. (d) ["the board may consider those sales that, *in its judgment*, involve properties similar in size, quality, age, condition, utility, amenities, site location, legally permitted use, or other physical attributes to the property being valued"], italics added; see *A. F. Gilmore Co. v. County of Los Angeles* (1960) 186 Cal.App.2d 471, 477–478 ["The board seemingly preferred and accepted the opinion of the assessors' witness to that of the witness of the appellants and this the board was entitled to do."].)

Second, the owner argues that the Board was prohibited from using the Carbon Beach comp in the County's comparative sales analysis because that property did not trade in an open-

---

[8]     We grant the owner's and the County's requests for judicial notice of excerpts of relevant handbooks and manuals used in the assessment process.  (Evid. Code, §§ 452, subds. (c), (h), 459, subd. (a).)

19

market transaction.[9]  The Board recognized that this $85 million transaction was not exposed to the open market, but included it in calculating the property's fair market value (albeit assigning it lesser weight in the calculation) because of the dearth of helpful sales data.  Indeed, the parties agreed before the Board that sales data for Carbon Beach is scarce.  Faced with valuing a sui generis home like the property here, the Board properly relied on the County's comp as one of the only sufficiently similar data available.  (*Midstate Theaters*, *supra*, 55 Cal.App.3d at p. 880; Bd. of Equalization, Assessors' Handbook, Basic Appraisal, § 501 (Jan. 2002), p. 94 ["usefulness" of comparative sales approach is "limit[ed]" where "certain types of property are infrequently sold" and "few comparable sales exist"].)

Third, the owner argues that the County submitted only "threadbare" evidence and "unverified" data in support of its comparative sales analysis.  (See Bd. of Equalization, Assessors' Handbook, Advanced Appraisal, § 502, ch. 3 (Dec. 1998), p. 35 ["Application of the comparative sales approach requires detailed, verified data regarding the subject and comparable properties"].) This argument fails because the "technical rules relating to evidence and witnesses" do not apply to proceedings before the Board and, in any event, the owner waived any challenge to the County's evidence by failing to object.  (Cal. Code Regs., tit. 18, § 313, subd. (e).)

Fourth, the owner argues that it was denied due process because the appraiser who prepared the County's analysis did not testify at the hearing and the witness who did testify on behalf of

---

9      The County continues to assert that its Carbon Beach comp qualifies as an open-market transaction, but the County failed to appeal the Board's decision finding to the contrary.

20

the County could not answer several basic questions about the County's analysis. The owner was not denied due process. The owner was afforded "[a] full and fair hearing" with a "reasonable opportunity" to cross-examine the County's witness.[10] (Cal. Code Regs., tit. 18, § 313, subd. (e); *Dressler, supra,* 64 Cal.App.3d at p. 567; see *Mitchell, supra,* 60 Cal.App.4th at p. 501 [where appraiser who prepared analysis was not the witness who testified, party objected to analysis on the basis of hearsay and inability to cross-examine]; cf. *People ex rel. Department of Public Works v. Reardon* (1971) 4 Cal.3d 507, 512–513 [violation of due process in eminent domain case where trial court curtailed all inquiry into circumstances of other sales].) At bottom, the owner's due process-based argument is a veiled attempt at attacking the sufficiency of the County's evidence supporting the Board's valuation of the property.

Fifth and finally, the owner argues that the defects in the County's comparative sales analysis establish that the valuation of the property was based on an invalid methodology and, therefore, we should review the Board's determination de novo. This argument lacks merit. Unlike the cases cited by the owner where the local assessor failed to perform the steps required by the comparative sales approach, the methodology here was properly applied—the owner simply disagrees with the County's comps and the sufficiency of its proof. (See *Main & Von Karman*,

---

**10** In addition, the owner could have requested that the appraiser who prepared the County's analysis be subpoenaed to appear at the hearing or that the hearing be continued to enable that appraiser to appear. (Cal. Code Regs., tit. 18, § 322, subd. (a) [subpoena]; County of Los Angeles Assessment Appeals Board Rules (June 2010), rule 23(B) [continuances].)

21

*supra*, 23 Cal.App.4th at pp. 340–341 [local assessor made no adjustments to comps based on belief that law governing comparative sales approach was merely a guideline and not a requirement; de novo review applied]; *Mitchell, supra*, 60 Cal.App.4th at p. 504 [witness was not assessor who prepared analysis and could not explain why assessor used "short-cut practice of making an 'overall adjustment'"; de novo review applied]; *Midstate Theaters, supra*, 55 Cal.App.3d at pp. 880–881 [same].)  Those disagreements present a garden variety substantial evidence challenge.

**DISPOSITION**

The judgment is affirmed.  The County is entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


KUMAR, J.[*]

We concur:


MOOR, Acting P. J.


KIM (D.), J.

---

[*] Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.